IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICE V. VASQUEZ,<br><br>    Petitioner,<br><br>  v.<br><br>TOM FELKER,<br><br>    Respondent.     / | No. C 08-05051 SI<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING A CERTIFICATE OF APPEALABILITY IN PART** |

**INTRODUCTION**

This matter is now before the court for consideration of the merits of Maurice Vasquez's petition for writ of habeas corpus concerning his 2004 conviction for kidnaping and possession of a firearm. Petitioner alleges violations of his Fifth and Sixth Amendment rights, as applied to the states through the Fourteenth Amendment. For the reasons discussed below, the petition is DENIED.

**BACKGROUND**

**1.    Procedural Background**

In 2004, a jury in Santa Clara County found Petitioner Vasquez, with his co-defendant Juan Carlos Posadas, guilty of kidnapping and possession of a firearm by a convicted felon. Petitioner was sentenced to 19 years in prison— eight years for the kidnapping conviction, ten years for the firearm enhancement, and one additional year for his prior conviction. Posadas was sentenced to 25 years in prison.

Petitioner directly appealed the judgment in the California Court of Appeal, Sixth Appellate District. In conjunction with the direct appeal, Petitioner filed a petition for habeas corpus relief with that court. Posadas similarly filed a direct appeal and habeas petition, and the Court of Appeal consolidated their actions. On April 25, 2007, the Court of Appeal affirmed the judgments against Petitioner and Posadas, and denied their habeas petitions. Petitioner filed for rehearing. On May 17, 2007, the Court of Appeal issued an order modifying sections of the Court's original opinion, but the supplemental order did not alter the disposition against either defendant.

Petitioner filed for review in the California Supreme Court, raising the constitutional issues presented in the instant petition. The California Supreme Court denied his petition on August 8, 2007.

**2.     Factual Background**

Petitioner's conviction stems from events that transpired on the night of March 15, 2003. The prosecution argued that Petitioner Vasquez and Posadas kidnaped Guillermo Velasquez at gunpoint, in an unsuccessful attempt to protect Posadas's identity as a confidential informant for California's Bureau of Narcotics Enforcement (BNE). The defense argued that Velasquez fabricated the story.

The California Court of Appeal's described the facts as follows:

A. Introduction

The jury found defendants guilty of kidnapping Guillermo Velasquez (Victim). Victim's story was that defendants had stopped him on the road, forced him at gunpoint out of his car, bound his hands, and then forced him into their car and drove away. During the short drive that followed, Posadas held a gun pointed at Victim's rib cage and told him he wanted him to "cooperate." Before they had driven very far the car got stuck in the mud. Defendants ordered Victim out of the car and he managed to escape by running away through an orchard where he encountered a husband and wife at their residence and prevailed upon them to call 911. Victim claimed he had no idea why Posadas and Vasquez had kidnaped him.

The prosecution's theory revolved around the fact that Posadas was a confidential informant for the Bureau of Narcotics Enforcement (BNE). The prosecution argued that Posadas was afraid that Victim had discovered he was an informant and, therefore, Posadas and Vasquez planned to kill him so that he would not reveal that Posadas was an informant. The defense argued that Victim was a drug dealer who had got into the car to negotiate a drug deal, that he was the one with the gun, and that when the car got stuck he ran away and made up the story about the kidnapping.

B. The Prosecution's Case

Victim was the prosecution's first witness. He testified through a Spanish language interpreter. Victim testified that he had met Posadas, whom he knew as "Shorty," while the two were in jail in 2000. Victim was then serving a six-month sentence for perjury. After his release, Victim worked for Posadas's uncle for a few months doing landscaping. Victim had met Posadas on a few other occasions, as well.

Posadas was a confidential informant working with BNE agents Eduard Heredia and Mitchell Fox. Posadas had an extensive knowledge of the world of narcotics and methamphetamine. He first began supplying information to BNE in order to "work off a criminal case." Thereafter, he continued to supply information for cash. Heredia and Fox considered Posadas to be a reliable informant. On about eight to 10 occasions they had obtained search warrants in response to information Posadas had given them. On each occasion the agents uncovered large quantities of illegal drugs, mostly methamphetamine. Altogether, Posadas's tips led to the discovery and seizure of hundreds upon hundreds of pounds of methamphetamine. By the time of the incidents alleged in this case the BNE had paid Posadas about $30,000 for his information.

Posadas did not work under the direction of the BNE agents but tended to work on his own, gathering information. The BNE never authorized him to buy or sell drugs in order to obtain information. If Posadas had engaged in any such transactions, it was without the knowledge of the BNE and would have subjected him to criminal penalties had his conduct been discovered by law enforcement. It was understood that the informant's identity was to remain confidential to protect both the integrity of the criminal investigations and the safety of the informant.

In or about 2001, Posadas told Heredia and Fox that Victim was distributing methamphetamine and was planning to manufacture it at the trailer in which he lived in a remote area of Morgan Hill. BNE investigated and learned that Victim associated with or was related to persons known to be involved in the manufacture or sale of methamphetamine. The agents also observed Victim's trailer and determined that it was located in a logical spot for setting up a clandestine methamphetamine laboratory.

In early 2003, Posadas and Victim drove to Fremont to meet with Posadas's father about landscaping work for Victim. While they were stopped a short way from their destination, a law enforcement officer approached them and searched them for narcotics. The anticipated meeting with Posadas's father never took place.

According to his testimony at the preliminary hearing, Victim's contacts with Posadas had mostly involved either the effort to obtain work or Posadas's interest in buying one of the goats Victim tended at the property where the trailer was located. Victim later recalled that shortly after the trip to Fremont, he had called Posadas to try and sell him his truck. Victim claimed that he wanted to buy a taco truck and that he needed to sell his pickup truck to pay for it. Victim made about 40 calls to Posadas for this purpose, 29 of those calls were made in one day on February 20, 2003.

On February 27, 2003, agent Fox and a team of law enforcement officers executed a search warrant for Victim's trailer. They uncovered nothing other than some old marijuana that Victim's aging uncle used to make a potion to rub on his joints. There was no methamphetamine and nothing to suggest that the trailer had been or was being prepared to be a methamphetamine laboratory. This was the first time Heredia and Fox had obtained a search warrant based upon a tip from Posadas and had not found what they were looking for.

On March 15, 2003, 16 days after the fruitless search of Victim's trailer, Victim was returning home around 6:00 or 7:00 p.m. when he saw defendants' car coming toward him. Defendants stopped their car and waved at Victim to stop, which he did. Defendants got out of their car and

3

told Victim to come with them. Victim refused and defendants each took out a gun. Posadas told Victim that Vasquez was with law enforcement. Posadas reached in, turned off Victim's truck, and took the keys out of the ignition. Victim exited his truck and was told to get down on his knees. Vasquez removed Victim's belt and bound Victim's hands behind him with the belt. Defendants then ordered Victim into their car and they drove off. Victim's cell phone was left behind in his truck. Victim was in the back seat with Posadas, who held a gun to Victim's ribs. Posadas told him he wanted him to cooperate. He asked Victim why he was so scared and told him he would not be the first person he had killed.

Vasquez, who was driving, missed the ramp to the freeway and, while attempting to make a U-turn on the road that runs behind Live Oak High School, drove the car into a ditch where it got stuck. Just before getting stuck, defendants had thrown Corona beer bottles out of the car. With the car in the ditch, the trio got out and Vasquez ordered Victim to go stand by the orchard on the side of the road opposite the high school. Victim backed away toward the orchard, working his hands free of the belt as he walked. About this time a passing car had stopped by the stranded vehicle. Vasquez tucked his gun into his waistband. When he turned away from where Victim was now standing, Victim turned and ran into the orchard, by now holding his belt in his hands.

Victim soon came to a trailer where Maria Yaez was just driving up in a car. Mrs. Yaez testified that Victim had a belt in his hands. He told her that three men were chasing him with guns and asked her to call the police. She was afraid and told Victim to go talk to her husband. Jose Yaez first thought that Victim was drunk or on drugs but soon he understood that he was just "really, really frightened." He stood in the bushes frightened and crying. Mr. Yaez instructed his wife to call the police and then gave the phone to Victim. Victim reported that men were chasing him with guns.

Around the same time, Police Officer Andrew Jackson was patrolling the area around Live Oak High School when he came upon the stranded car and a truck with a winch attempting to pull the car out of the ditch. Vasquez was standing to one side speaking on a cell phone. Posadas was pacing back and forth. As Jackson was speaking with the two men a call came over his two-way radio alerting him (and defendants) to the report of a victim being chased by persons with guns. The description of the suspects and their car matched defendants and the vehicle in the ditch. Defendants denied any involvement. Posadas produced a fraudulent driver's license and murmured that he was a BNE agent. Jackson did not know what he was talking about but he could tell Posadas urgently wanted to get the information across to him.

Meanwhile, Sheriff's Deputy Jose Zuniga responded to the call from the Yaez residence. He found Victim "shaking, scared." He kept repeating, "They're going to get me; they're going to get me." Zuniga transported Victim to where the car was stranded and Victim identified defendants as his abductors. Jackson observed that Victim had light red linear abrasions on the outside of his wrists and "scuff marks" on the inside.

Defendants were taken into custody. A search of the area revealed a Colt .45 semiautomatic handgun in an "inside the pants" holster wedged in the fork of a tree in the orchard. The gun was loaded with a live round in the firing chamber and an extra magazine stored in the holster. When one officer announced that he had found the gun, another officer observed that defendants "slumped in their seats and slumped their heads and waved their heads." Prior to that they had been very casual, almost nonchalant. Three full bottles of beer were found placed along the fence line by the school grounds across the street from the orchard. Victim's keys were on the console in the front seat of defendants' car. His pickup truck was still parked on the side of the road leading to his trailer. No other gun was found. Police activated a recording system in the police vehicle in which defendants had been placed. The tape picked up the sound of defendants whispering to each other but much of the tape was unintelligible.

4

C. The Defense Case

Posadas did not testify at trial; Vasquez did. Vasquez testified that he ran an "escort service" and had arranged for some girls to meet with Posadas and Victim on the night of March 15, 2003, around 7:00 p.m. Vasquez and Posadas drove to Victim's trailer and when he was not there they turned around and were driving away when they saw his pickup truck approaching. They all stopped. Victim left his truck and got into the car in the front seat and threw his keys on the console. Victim and Posadas talked together in Spanish. Vasquez could only understand a little bit of what they said but he did understand Posadas to ask, "[W]hy do you only have two ounces" to which Victim responded, "later" and "I want to see some money." Vasquez identified the Colt .45 holster as the holster Victim had been wearing that night.

According to Vasquez, when the car got stuck in the ditch, Victim got out, grabbed three beer bottles, walked across the street to the fence, and looked around. Then he walked back across the street to the side where the orchard was. Meanwhile, a passerby had stopped to help and, after sizing up the situation, left to get a friend who had a truck with a winch. When the person returned and Vasquez began talking with him, Victim looked agitated and then just darted off.

Rebecca Serrato, one of Vasquez's girlfriends, testified that she and two friends had planned to meet Vasquez and two of his friends at a hotel in San Martin, California, on the night the alleged kidnapping took place. She was not sure of the exact time they were supposed to meet but it was "[b]etween 7:00 or something like that." Serrato had not yet left Sacramento when she learned that meeting would not take place. Serrato admitted to being close to Vasquez and having visited him many times in jail. The most recent visit was just two days before her testimony.

Petitioner's Exhibit A (Cal. Ct. App. Opinion, Case Nos. H028233, H029168, H030783, H030954), 2-8 ("Opinion").

**STANDARD OF REVIEW**

This Court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court

5

decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

Even if this Court finds the state court's adjudication of Petitioner's claim to satisfy 28 U.S.C. § 2254(d), the petition still may not be granted unless the state court's error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

**DISCUSSION**

Petitioner alleges that his Sixth Amendment right to confront adverse witnesses was violated by the state prosecutor's prejudicial questioning and the trial court's ruling that permitted two questions regarding a statement Petitioner allegedly made to his co-defendant, Posadas. Petitioner argues that the California Court of Appeal misapplied *Chapman v. United States*, 386 U.S. 18 (1967), when finding no prejudice from the error. Petitioner also argues that the Court of Appeal unreasonably rejected his Sixth Amendment ineffective assistance of counsel claim, and did so without an adequate development of facts.

**1.    Confrontation Clause Claim**

    **A.    Factual Background**

After Petitioner and Posadas were taken into custody, the two were placed in the back of a police cruiser. An officer secretly placed a tape recorder in his car, in an attempt to record any conversation

6

that occurred between the two men. The recording, however, was largely inaudible; while the defendants could be heard whispering on the tape, very few statements could be clearly understood. A transcript of the tape was made, but neither the tape nor the transcript was offered in evidence.

The conversation between the two defendants was not mentioned in the trial until the prosecution's cross-examination of Petitioner, who testified in his own defense. The prosecutor asked Petitioner a series of questions about his statements to Posadas, based upon the contents of the tape. The prosecutor's final question about the conversation was: "When you were in the proximity of Mr. Posadas, at some point you said, 'If I get out on Friday, the victim's dead on Sunday'; is that correct?" Respondent's Exhibit 1, Reporter's Transcript ("RT") 701. Defense counsel objected to the question. The objection was sustained after a brief sidebar, and the prosecutor began a line of questioning unrelated to the discussion between the defendants.

After Petitioner's testimony, the court excused the jury and held an evidentiary hearing related to the contested question. The prosecution's basis for asking the question came from a declaration, submitted to the trial court in connection with a bail hearing, filed by Deputy District Attorney Vonda Tracey. The declaration stated:

> On March 19, two California Depart of Justice Agents contacted me. They informed me that they had visited Defendant Posadas in jail on an unrelated case. During their conversation, Posadas relayed that his Codefendant, Vasquez, had stated that if he (Vasquez) gets out on Friday, [the victim] won't be around by Sunday.

Pet. 16:4-7. Both defendants opposed the question on multiple grounds, including prosecutorial misconduct, violation of evidentiary rules, and state and federal precedents. Acknowledging that the prosecutor's statement involved "multiple levels of hearsay," the court described the basis for the prosecutor's statement as follows: "A deputy District Attorney who's an officer of the court making a memo indicating that he or she had – was told by an BNE law enforcement agent that this – that Mr. Posadas made a statement [in] which he attributes a statement to the co-defendant [Vasquez]." RT 714: 18-23. After consideration and over the objections of defendants, the judge allowed the prosecutor to ask a different version of the same question that omitted Posadas's name. RT 720:1-2.

After the recess, the prosecutor continued with cross-examination. He briefly questioned Petitioner about statements whispered to Posadas in the patrol car, and then asked: "At any point had

1  you ever said that if you get out of jail on Friday, the victim would not be around by Sunday?" RT
2  722:4-5. Petitioner denied making the statement, and the prosecutor ended his cross-examination.

### B.     Court of Appeal Decision

The Court of Appeal held that either version of the question was improper under California law as the questions "implied the existence of a harmful fact that the prosecutor was unable to prove." Opinion at 10. The court also noted that prosecution's first question was in violation of "the trial court's in limine ruling . . .[and] was clearly misconduct," and "[t]he trial court compounded the error by permitting the revised version" of the question. *Id*. at 11. The Court of Appeal, however, did not explicitly decide whether the error was simply a state law evidentiary violation – which, under *People v. Watson*, 26 Cal.2d 818, 836 (1956) would require reversal unless the error was harmless – or a violation of Petitioner's Sixth Amendment rights – which, under the more rigorous standard of *Chapman v. California* 386 U.S. 18, 24 (1967), would require reversal unless the error was shown to be harmless beyond a reasonable doubt. Instead, the Court presumed a violation of the Petitioner's Sixth Amendment rights and applied the more strenuous *Chapman* standard. The Court concluded that any error caused by the prejudicial questioning was harmless,

### C.     *Analysis*

Petitioner contends that the prosecutor's questions constituted a violation of established Supreme Court Confrontation Clause jurisprudence, specifically the principles set forth in *Douglas v. Alabama*, 380 U.S. 415 (1965), *Bruton v. United States*, 391 U.S. 123 (1968), and *Crawford v. Washington*, 541 U.S. 36 (2004) because Petitioner was not able to examine his co-defendant, who did not testify and who was the source of the statement attributed to Petitioner. Respondent argues that the questions did not amount to a violation of clearly established federal law and that, because Petitioner was the declarant of the statement used in the prosecutor's questions, Petitioner cannot complain of the inability to confront himself. As noted above, the California Court of Appeal did not decide whether the questions violated Petitioner's Sixth Amendment rights, but simply assumed they did and found the error harmless under *Chapman*.

8

1   This Court has significant doubts about whether the prosecutor's questions violated the
2   Confrontation Clause where there was no testimony or other evidence admitted regarding Petitioner's
3   alleged statement itself or that the *source* of the statement was Petitioner's non-testifying co-defendant,
4   Posadas.[1] Nonetheless, the Court will assume for current purposes that the questions were in violation
5   of Petitioner's Sixth Amendment rights, but for similar reasons expressed by the state Court of Appeal,
6   finds that the error was harmless.

7   The California Court of Appeal applying the *Chapman v. California*, 386 U.S. 18 (1967)
8   harmless error test, found that in light of the other evidence in the case and the trial judge's clear
9   instructions that *questions* were not evidence and could not be considered, that the prosecutor's
10  questions were harmless beyond a reasonable doubt. Opinion at 13-15. Petitioner argues that the
11  appellate court's application of *Chapman* was unreasonable, requiring relief here. However, upon
12  collateral review, this Court should determine whether the error was harmless under the "actual
13  prejudice" test from *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (an error will be harmless unless
14  it has a "substantial and injurious effect or influence in determining the jury's verdict."). The Supreme
15  Court and Ninth Circuit have both recognized that the *Brecht* test subsumes the AEDPA/*Chapman* test,
16  and should be applied when determining the prejudicial impact of federal constitutional error in a state-
17  court criminal trial. *See Fry v. Pliler*, 551 U.S. 112, 120 (2007); *see also Ocampo v. Vail*, 2011 U.S.
18  App. LEXIS 11588, *42-43 n.17 (9th Cir. Wash. June 9, 2011).

19  "In general, the inquiry into whether the constitutionally erroneous introduction of a piece of
20  evidence had a substantial and injurious effect is guided by several factors: 'the importance of the
21  testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating
22  or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the
23  prosecution's case.'" *Ocampo v. Vail*, 2011 U.S. App. LEXIS 11588, *43 (quoting *Whelchel v.*
24  *Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000)).

---

[1] A reasonable implication is that the prosecutor was simply asking Petitioner about a statement that was captured on the recording made while Petitioner and his co-defendant were in the back of the police cruiser.

9

### I. Importance of testimony

The Court finds, that in light of all of the evidence introduced at trial, the two questions at issue were not significantly important to the jury's verdict. Most importantly, this is not a case where the out-of-court statement directly inculpated the defendant in the commission of the crime. *Cf. Whelchel v. Washington*, 232 F.3d 1197, 1203 (9th Cir. 2000) (tape recorded statements of non-testifying witnesses that defendant intended to kill and killed defendant).[2] If Petitioner's unequivocal denial was disbelieved, the jury could at most infer from the prosecutor's questions that Petitioner threatened to kill Velasquez. The threat, itself, could be explained by multiple theories. The first is that Petitioner wanted to kill the victim so the victim could not testify against Petitioner, the implication being that Petitioner committed the crime, kidnapping Velasquez. However, another equally plausible inference from the statement is that Petitioner was angry about being set up by Velasquez. That inference is fully consistent with the defense theory at trial, that Velasquez wanted to sell drugs to Petitioner and Posadas, fled when Posadas' car drove into a ditch, and then set up Petitioner and Posadas. *Cf. Ocampo*, 2011 U.S. App. LEXIS 11588, *44-45 (confrontation clause error not harmless where out-of-court statement of non-testifying witness contradicted defense that accused was not at the scene of the crime). Given the chain of inferences necessary to attach any significance to the prosecutor's statements, and the fact that there are equally plausible inferences that do not inculpate Petitioner, the Court cannot find that the questions played an "important" part in the jury's determination.

This conclusion is bolstered by the fact that the questions themselves were brief – two one-sentence questions towards the end of Petitioner's testimony. They were not a centerpiece of the prosecution's case and were not mentioned by the prosecution in closing argument. There is simply no evidence that the implication that defendant had threatened to kill Velasquez when Petitioner was in custody was a central issue in this trial. *Cf. Ocampo*, 2011 U.S. App. LEXIS 11588, *39 (noting that

---

[2] *See also Douglas v. Alabama*, 380 U.S. 415, 417 (1965) ("The statements from the document as read by the Solicitor recited in considerable detail the circumstances leading to and surrounding the alleged crime; of crucial importance, they named the petitioner as the person who fired the shotgun blast which wounded the victim.")

10

1  prosecutor's use of non-testifying witnesses' out-of-court statements in closing, indicated the importance
2  of the statements and confirmed how the jury most likely understood the statements).

### ii. Extent of cross-examination permitted

This factor is not directly on point given the posture of this case. Typically, the focus of this factor is whether the defendant against whom the statement was admitted had an opportunity to cross-examine the source of the statement. *See e.g., United States v. Ghilarducci*, 480 F.3d 542, 549 (7th Cir. 2007) Here, Posada, the source of the statement allegedly made by Petitioner, did not testify. However, the Court finds it significant that, because Petitioner testified in his own defense, he was able to unequivocally *deny* that he made the challenged statement.

### iii. Overall strength of prosecution's case

The Court also finds that, overall, the prosecution had a strong case. As the Court of Appeal noted, important physical evidence supported the prosecution's case. For example, the fact that Velasquez's pickup truck was left, unlocked and with his cell phone in it, on the side of the road as opposed to up the hill at the trailer where he lived, all indicate that Velasquez did not voluntarily leave his truck. Similarly, the fact that the keys to Velasquez's truck were left on the dashboard of Posadas' car, supports the prosecution's theory that Velasquez, fearing for his life, fled from the car when the opportunity arose. Further, the fact that Velasquez had minor abrasions on his wrist is consistent with his position that his hands were bound. There was also strong testimony by three witnesses who testified that Velasquez was pleading for help and shaking with fear, supporting the prosecution's theory that Velasquez was kidnaped and had escaped. The testimony from the third-party witnesses is not attacked as being self-interested or otherwise subject to disbelief. *Cf. Whelchel,* 232 F.3d at 1208 (discounting third-party testimony from individuals involved in the victim's murder or who had received deals from prosecution in exchange for testifying). Petitioner does not show that there are reasons for the jury to have doubted these third-party's testimony which supported the prosecution's version of the

11

events.[3]

Finally, the trial court instructed the jury, twice, that statements of attorneys are not evidence. RT 35, 746.[4] The trial court also instructed the jurors that questions are not evidence, and instructed them not to assume to be true any insinuation suggested by a question. RT 35, 747. These points were underscored by Petitioner's own counsel in closing. *See* RT 836-37 (arguing that the jurors cannot infer anything from the prosecutor's challenged questions). Juror are presumed to understand and follow instructions. *See, e.g., McKenzie v. Risley*, 842 F.2d 1525, 1533 & n.16 (9th Cir. 1988). This is not a case where the challenged material – here in the form of two brief questions by the prosecutor - was critically inculpatory (like a confession) or was made a centerpiece of the prosecution, such that the jury could not be presumed to follow the instructions; thus this case materially differs from *Bruton v. United States*, 391 U.S. 123 (1968) (jurors could not be expected to disregard accomplice's out of court confession).

In the end, this Court does not find that the prosecutor's questions had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. Petitioner simply has not shown cause to find "grave doubt" that the error – again assuming a confrontation clause error occurred – was not harmless. *Caifornia. v. Roy*, 519 U.S. 2, 5 (1996).

### 2. Ineffective Assistance of Counsel

Petitioner contends that he received ineffective assistance of counsel at trial because his counsel missed opportunities to impeach the testimony of Velasquez and because counsel failed to sufficiently

---

[3] The Court also finds, in light of the evidence and testimony at trial, that the defense's theory of the case was weak. Velasquez's actions -- fleeing from the stranded car when help arrived; running through an orchard at night, allegedly discarding his gun along the way, in hopes of finding a house where he could use the phone to call the police to report a kidnapping, all in order to set up Petitioner and Posadas – are not consistent actions for someone who had intended to sell them drugs and then fled when he himself feared a set up.

[4] Petitioner does not contend that significant *evidence* implicating him in the crime charged was improperly admitted at trial, but rather argues that jurors may have impermissibly inferred from the Prosecutor's questions that Petitioner threatened Velasquez or had the intent to kill him. Thus this case differs from *Ocampo*, 2001 U.S. App. LEXIS 11588 *24-25 (confrontation clause violation where testimony of two police detectives introduced "critical content of an out-of-court statement" from a non-testifying witness implicating defendant in commission of crime charged).

12

challenge the prosecution's motive theory in closing arguments.

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Moormann v. Ryan*, 628 F.3d 1101, 1106 (9th Cir. 2010); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). First, the petitioner must show that counsel's performance was objectively unreasonable, which in the appellate context requires the petitioner to demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue. *Smith*, 528 U.S. at 285; *Moormann*, 628 F.3d at 1106. Second, the petitioner must show prejudice, which in this context means that the petitioner must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in his appeal. *Smith*, 528 U.S. at 285-86; *Moormann*, 628 F.3d at 1106. A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011); *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 131 S. Ct. at 788.

### A.     Impeachment of Velasquez

Petitioner argues that, because trial counsel was concerned with missing a golf tournament, he purposefully abstained from using relevant evidence to impeach the testimony of Velasquez, which would have required re-calling Velasquez to the stand, thereby lengthening the trial and interfering with counsel's golfing plans. Petitioner also contends that trial counsel was dissatisfied with his fee, and, therefore, was not inclined to extend the length of the trial by re-calling Velasquez. The foregone examination about which Petitioner complains concerns the 911 call made while Velasquez was being assisted by Maria and Jose Yaez; the operator twice told Velasquez that police "already had" the suspects, yet according to the testimony of Officer Zuniga Velasquez was still "shaking and scared" and kept looking around, repeatedly worrying that petitioner and his co-defendant were "going to get me," when the officer arrived to interview Velasquez. Petitioner asserts that this evidence was critical to his

13

theory that Velasquez was fabricating his story and feigning his fear. Petition at 33-34.

The Court of Appeal held that "counsel could have had a rational tactical purpose for failing to pursue this evidence," specifically noting that parts of the 911 transcript corroborated Velasquez's story and "could have done more harm than good." Opinion at 27. The question this Court determines is whether there are "any reasonable grounds" to support the California Court's determination that appellate counsel made appropriate tactical decisions in declining to pursue the evidence and, in this case, there are. *See Richter* 131 S. Ct. at 788. At best, impeachment of Velasquez based on Officer Zuniga's testimony and the 911 transcript would have suggested that Velasquez was overreacting and had fabricated his story. At worst, introduction of that evidence would have cemented in the jury's mind that Velasquez genuinely feared for his life. The decision was a judgment call, and not one that clearly falls below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also Brodit v. Cambra*, 350 F.3d 985, 994 (9th Cir. 2003) (state court reasonably concluded that trial attorney provided effective assistance of counsel where attorney declined to present evidence favorable to defense out of concern that it would open door to unfavorable evidence).

### B. Failure to Challenge Prosecution's Motive Theory

Petitioner also argues that his trial counsel's failure to adequately challenge the prosecution's theory of Petitioner's motive – that Posada wanted to kill Velasquez in order to silence him from disclosing Posada's status as an informant – constituted ineffective assistance of counsel. The Court of Appeal found:

> The transcript of counsel's closing argument reveals that he challenged the prosecution's motive theory at length, focusing primarily upon inconsistencies in Victim's testimony. Counsel might reasonably have believed this to be the strongest argument, best conveyed if presented simply. Thus, Vasquez has not affirmatively shown that counsel had no rational, tactical purpose for failing to include these points in his closing argument.

Opinion at 28. As above, there are reasonable grounds to support the Court of Appeal's conclusion. Deference to counsel's tactical decisions in closing presentation is particularly important because of the broad range of legitimate defense strategies at the time. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*) (counsel's exclusion of some issues in closing did not amount to professional error of constitutional magnitude where issues omitted were not so clearly more persuasive than those raised).

In closing arguments, the prosecution explicitly stated that the prosecution's motive theory did not apply to Vasquez: the prosecutor said, "The BNE agents, they provide what is unnecessary in a criminal case, but which can be helpful, motive. No motive for Mr. Vasquez because he doesn't know these people." Moreover, Posadas's counsel devoted a portion of her closing argument to debunking the prosecution's motive theory, RT 801:15 - 802:17, and suggesting ulterior motives for Velasquez. RT 802:18 - RT 804:4. Petitioner's counsel could easily have deemed this argument as sufficient, especially in light of the prosecutor's statement that his motive theory did not apply to Petitioner. Finally, it appears that Petitioner's counsel did, in fact, devote a limited amount of time to directly challenging the prosecution's motive in his closing argument. RT 829:26 ("'Well, let's talk about this motive to kill Mr. Velasquez because he blew his cover.'") Despite limited a limited attack on the prosecution's motive theory in closing, counsel's focus on impeaching Velasquez, in his eyes, may well have been the most efficient use of his time. It is impossible to say this decision did not meet an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

### C. Evidentiary Hearing

Petitioner also requests the Court hold an evidentiary hearing before resolving his ineffective assistance of counsel claim. However, this request is foreclosed by the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). In *Pinholster*, the Supreme Court held that where habeas claims had been decided on their merits in state court, a federal court's review under 28 U.S.C. section 2254(d)(1) - whether the state court determination was contrary to or an unreasonable application of established federal law - must be confined to the record that was before the state court. 131 S. Ct. at 1398. The *Pinholster* Court specifically found that the District Court should not have held an evidentiary hearing regarding Pinholster's claims of ineffective assistance of counsel until after the Court determined that the petition survived review under Section 2254(d)(1). *Id.*, at 1398. Here, the Court has determined that none of Petitioner's claims survive review under Section 2254(d)(1), and, therefore, his request for an evidentiary hearing is denied as moot.

### 3. Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Habeas Corpus Cases Under Section 2254, the Court has reviewed the record in this case and issues a certificate of appealability on petitioner's claim of violation of the constitutional right to confrontation. As to his claims of ineffective assistance of counsel, a certificate of appealability is denied because petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). That is, he has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## CONCLUSION

For the reasons stated above, the petition for writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: October 13, 2011

SUSAN ILLSTON
United States District Judge